OPINION
{¶ 1} A.K. appeals from his adjudication of delinquency for Aggravated Robbery and subsequent commitment to the Department of Youth Services. A.K. contends that the trial court erred in denying his Crim. R. 29 motion for acquittal and that his resulting adjudication was not supported by sufficient evidence. Because the State offered *Page 2 
sufficient evidence to overcome A.K.'s Crim. R. 29 motion for acquittal and to support A.K. `s adjudication of delinquency on the charge of Aggravated Robbery, the judgment of the trial court is affirmed.
 I {¶ 2} Matthew Pisano and Kenneth Booth were employed at the Trotwood Cork and Brew Drive Through, owned in part by Trenton Branum. Pisano, Booth, and Branum were present when four young men approached the business at about 10:45 p.m. in early January, 2006 with an intent to rob it. Much of the incident was recorded on the drive-through's surveillance system.
 {¶ 3} Pisano was standing just outside of the exit when he first noticed four men coming toward the drive through. Booth and Branum were talking in the office but saw armed men run in through the exit. Although Pisano, Booth, and Branum were unable to describe two of the men, they were able to give descriptions of the closer two. They described the first as a black male dressed in a white hooded sweatshirt with his hood pulled up. He was carrying a long-barreled revolver with the barrel tinted gold due to rust. The second they described as a black male wearing all dark clothes, also with his hood up and carrying a smaller handgun that looked like a Glock. Both men were wearing dark masks or cloths covering most of their faces and dark gloves.
 {¶ 4} The men ordered Pisano to freeze and get down onto the ground. As soon as Pisano got to the ground outside of the door, one of the men pulled him to his feet, brought him inside the drive through, and pushed him back to the ground. The two intruders headed for the office. *Page 3 
 {¶ 5} When Booth and Branum saw the men heading toward the office, Branum grabbed his gun and yelled at Booth to get down. The man in the white, hooded sweatshirt started to enter the office with the revolver in his outstretched right arm. Branum fired a shot at the man, who was just a couple of feet away, and the intruders turned and fled. Branum fired more shots. He believed that he had hit the man in the white, hooded sweatshirt with his first shot.
 {¶ 6} Shortly after the suspects fled the drive-through, Trotwood Police Officer Patrick O'Connell was dispatched to an apartment on a call for medic assistance for a man reportedly shot. O'Connell arrived before the medics and knocked on the door. He knocked hard and very loudly five times before someone asked who was there. After O'Connell identified himself and demanded that the door be opened, he could hear a lot of movement inside the apartment. There was another delay of two to three minutes before the door was finally opened.
 {¶ 7} Inside the apartment O'Connell immediately saw sixteen-year-old A.K. lying on a chair with a gunshot wound to his right elbow. Bloody clothes were on the floor at his feet. A neighbor woman, accompanied by her son, was holding a towel to the gunshot wound to slow the bleeding. Four other men were also in the apartment, one of whom was wearing all-dark clothing.
 {¶ 8} O'Connell conducted a protective sweep of the apartment and found two loaded firearm magazines. None of the occupants were forthcoming with information regarding the shooting, and the only thing that O'Connell learned was that A.K. claimed to have been shot while walking to the Marathon gas station. O'Connell was on duty, focusing on the area of the Marathon that night. He had neither heard any shots, nor *Page 4 
received any dispatches regarding shots fired.
 {¶ 9} Detective James Faulkner interviewed two of the men found in the apartment with A.K., as well as A.K. The three men gave inconsistent statements as to A.K.'s whereabouts when he was shot. Moreover, A.K. remained uncommunicative when Detective Faulkner visited him in the hospital the following day. All A.K. would say was "I was shot walking to the Marathon station, and that's all I know." When Faulkner tried to get more details, A.K. insisted, "I told you that's all I know." A.K. would not even tell Faulkner what time of day the shooting had occurred. Instead, he responded by saying, "I don't have anything to say." The interview ended after A.K. again told the detective that he had nothing more to say and told the detective to leave.
 {¶ 10} At the apartment, Evidence Technician Michael Vickers recovered from the living room floor a white T-shirt and a white, hooded sweatshirt, each with a bloody hole in the right sleeve. The sweatshirt had the words "Roca Wear" on the front. Also in the living room, he found four brown gloves, a black T-shirt with the sleeves cut off, and the grey sleeve from another T-shirt. Balled up in the back of a bedroom closet, Vickers found more cut-off sleeves from black T-shirts and black knit stocking caps rolled up inside yet another T-shirt. Under the mattress, Vickers discovered crack cocaine, some cash, keys, and an auto registration. From various locations around the apartment,. Vickers also recovered two nine-millimeter bullets, two firearms, and two loaded firearm magazines.
 {¶ 11} One of the guns recovered from the apartment in which A.K. was found was a long-barreled revolver. At trial Pisano, Booth, and Branum identified that revolver as the one carried by the man in the white, hooded sweatshirt. Additionally, surveillance *Page 5 
photos showed an armed man wearing a white, hooded sweatshirt with the words "Roca Wear" across the front.
 {¶ 12} The State filed a complaint alleging A.K. to be a delinquent child for committing Aggravated Robbery. The case was tried to the bench, and the trial court found A.K. responsible as charged. The court ordered A.K. into the custody of the Department of Youth Services for a minimum of one year and not to extend beyond his twenty-first birthday. A.K. appeals from his adjudication and commitment.
 II {¶ 13} A.K.'s First Assignment of Error is as follows:
 {¶ 14} "THE COURT ERRED BY RULING FOR THE PROSECUTION AND AGAINST THE DEFENDANT ON DEFENDANT'S CRIMINAL RULE 29 MOTION TO DISMISS."
 {¶ 15} A.K.'s Second Assignment of Error is as follows:
 {¶ 16} "THE COURT ERRED BY FINDING THE DEFENDANT GUILTY OF THE CHARGE OF AGGRAVATED ROBBERY."
 {¶ 17} In both assignments of error A.K. challenges the sufficiency of the State's evidence to support his adjudication on Aggravated Robbery. Specifically, A.K. argues that the State failed to place him at the scene of the crime. Because we find that the State offered sufficient circumstantial evidence both to overcome A.K.'s Crim. R. 29 motion for acquittal and to support the trial court's finding of responsibility, A.K.'s arguments fail.
 {¶ 18} Although this is, of course, a juvenile delinquency proceeding, both parties *Page 6 
accept the application of Crim. R. 29, which provides for a motion for a judgment of acquittal in a criminal proceeding. A juvenile delinquency proceeding is arguably within the extended scope of the Ohio Rules of Criminal Procedure alluded to in Crim. R. 1(C), since no specific procedure for an analogous motion is found in the Ohio Rules of Juvenile Procedure, and the procedure set forth in Crim. R. 29 is not "clearly inapplicable" to a juvenile delinquency proceeding. Accordingly, we will follow the lead of the parties in applying Crim. R. 29 to this issue.
 {¶ 19} Crim. R. 29(A) requires a trial court to enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such an offense. . . ." A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52. The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 20} A.K. argues that the State failed to offer any direct evidence placing him at the drive-through. But there is significant circumstantial evidence implicating A.K. in the Armed Robbery. *Page 7 
 {¶ 21} "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." Jenks, supra, at paragraph one of the syllabus. Moreover, circumstantial evidence need not be irreconcilable with any reasonable theory of innocence in order to support a conviction. Id.
 {¶ 22} In this case the three witnesses were able to give descriptions of the closer two intruders. They described the first as a black male dressed in a white, hooded sweatshirt with his hood pulled up and carrying a long-barreled revolver with the barrel tinted gold due to rust. They described the second as a black male wearing all dark clothes, also with his hood up and carrying a smaller handgun that looked like a Glock. Both men were wearing dark masks or cloths covering most of their faces and dark gloves.
 {¶ 23} Branum testified that the man in the white, hooded sweatshirt started to enter the office with the revolver in his outstretched right arm. Branum fired a shot at the man, and he believed that he hit the man in the white, hooded sweatshirt with his first shot.
 {¶ 24} Just minutes later, police received a call for medic assistance for a man reportedly shot. O'Connell was allowed into the residence only after repeatedly knocking and then waiting another couple of minutes, during which he could hear a lot of movement inside the apartment.
 {¶ 25} Inside O'Connell found A.K. lying on a chair with a gunshot wound to his right elbow. Two items of bloody clothing were on the floor at his feet. One of those items was a white, hooded sweatshirt with the words "Roca Wear" across the front. Not *Page 8 
only did the three witnesses say that one of the intruders was wearing a white, hooded sweatshirt, but the surveillance tape showed that one of the intruders was wearing a white, hooded sweatshirt with the words "Roca Wear" on the front. Moreover, the sweatshirt had blood on it and a bullet hole in the right sleeve. Branum believed that he had shot the intruder wearing the white, hooded sweatshirt in the right arm, who was just a couple of feet away.
 {¶ 26} Officer Vickers also recovered from the apartment four brown gloves, several T-shirt with sleeves cut off, some black sleeves that had been cut from T-shirts, and some dark knit stocking caps, some of which were likely used in the robbery. In various locations around the apartment, Vickers found two nine-millimeter bullets, two firearms, and two loaded firearm magazines. One of those guns was a long-barreled revolver. At trial Pisano, Booth, and Branum identified that revolver as the one carried by the man in the white, hooded sweatshirt.
 {¶ 27} Both Officer O'Connell and Detective Faulkner found the behavior of A. K. and the other occupants of the apartment to be very unusual. Typically, the officers explained, on a call involving a gunshot wound, the responding officer does not have to repeatedly pound on the door and then wait even longer for entry. Usually, he finds people very upset and waiting anxiously and urgently for the police, demanding that the perpetrator be found. In this case, the occupants were relatively calm.
 {¶ 28} Additionally, the occupants' refusal to provide even the most basic of information regarding the circumstances of the shooting was suspicious. Detective Faulkner interviewed A.K. and two of the men found in the apartment. The three gave inconsistent statements as to A.K. `s whereabouts when he was shot. The following day, *Page 9 
A.K. continued to maintain that he was shot while walking to the Marathon. When Faulkner asked for details, A.K. insisted, "I told you that's all I know." A.K. would not even tell Faulkner what time of day the shooting had occurred. He simply kept insisting that he had told the detective all that he knew and that he had nothing more to say.
 {¶ 29} When all of the circumstantial evidence is taken into consideration, the trial court could draw reasonable inferences from that evidence in determining that A.K. had been present at the drive-through and that he was responsible for Aggravated Robbery. Accordingly, the State offered sufficient evidence of A.K.'s responsibility for Aggravated Robbery to overcome a Crim. R. 29 motion for acquittal and to warrant his adjudication of delinquency. A.K.'s assignments of error are both overruled.
 III {¶ 30} Both of A.K. `s assignments of error having been overruled, the judgment of the trial court is Affirmed.
 BROGAN and GRADY, JJ., concur. *Page 1