[Cite as *State v. Winton*, 2017-Ohio-6908.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                        :
                                                     :
    *Plaintiff-Appellee*                             :      Appellate Case No. 27043
                                                     :
v.                                                   :      Trial Court Case No. 2014-CR-2247
                                                     :
RONALD WINTON, JR.                                   :      (Criminal Appeal from
                                                     :      Common Pleas Court)
    *Defendant-Appellant*                            :
                                                     :

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of July, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MICHAEL T. COLUMBUS, Atty. Reg. No. 0076799, 130 West Second Street, Suite 2103, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Ronald Winton appeals from his conviction and sentence for murder and felonious assault. He contends that the State did not present evidence sufficient to sustain the conviction and that the conviction is against the weight of the evidence. He further contends that the trial court erred by failing to suppress evidence and by ordering him to pay restitution.

{¶ 2} We conclude that there is sufficient evidence to support a finding that Winton committed the charged offenses, and that the conviction is not against the manifest weight of the evidence. We find no error in the trial court's decision to deny Winton's suppression motion or to require him to pay restitution. Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 3} On February 2, 2014, Dayton Police Officers responded to an apartment building located at 848 Riverview Terrace following a dispatch concerning a domestic violence and assault incident. Police arrived at the building at approximately 11:40 a.m. Once there, they observed Winton standing by the body of a woman later identified as Tasha Bonner. Winton was placed in handcuffs, and eventually transported to the Dayton Police Department Safety Building where he was interviewed.

{¶ 4} Winton's interview began at 2:05 p.m., and was conducted by Detectives Rebecca Rasor and Kevin Phillips. The interview was recorded. At the outset, Rasor went over the pre-interview form with Winton. Winton provided his name, address, social security number and date of birth. Rasor informed Winton that he was being interviewed

in relation to a suspicious death.

{¶ 5} The pre-interview form sets forth the following five rights and a waiver provision:

1. You have the right to remain silent. You do not have to make any statements or answer any questions.

2. Anything you say can and will be used against you in a Court of Law.

3. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

4. If you do not have the money to hire a lawyer, a lawyer appointed by the Court, or a lawyer from the Public Defender's Office, will be provided to you before and during the questioning without any cost to you.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

<u>WAIVER OF RIGHTS</u>

The above statement of rights has been read to me. I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

{¶ 6} Rasor had Winton read each of the five enumerated rights out loud and then he placed his initials beside each one after acknowledging that he understood each. As with the first two rights, once Winton read the third right, Rasor asked him whether he

understood it. Winton replied that he did. Winton went on to state, "[f]irst, I want to fully cooperate with you all and I want to talk to you, and I will. Maybe my lawyer should be with me, but I want to cooperate and answer any questions and everything that you want to do. I'm going to cooperate one hundred percent." Rasor then stated, "if you feel comfortable talking to your attorney or having your attorney with you before you talk to us, that's fine. It's – it's totally up to you." Rasor also informed Winton that he did not have to answer any questions, and told him that if he felt uncomfortable he could say "wait til I talk to my lawyer." Winton said, "okay." Then Phillips stated that Winton could stop the interview at any time by just telling them that he did not want to talk anymore. Winton again said, "okay."

{¶ 7} Winton then began to relate the events of the prior evening, at which time Rasor interrupted him, and asked him to initial the right they had just discussed on the pre-interview form. Winton then placed his initials in the appropriate spot and stated, "Like I said, I probably would need one, but I am willing to talk to you all prior to an attorney or somebody coming. I want to co-operate and everything fully." Winton then finished reading and initialing the pre-interview form. He also read the waiver of the rights out loud. Winton filled in a section indicating that he had completed 14 years of schooling. Rasor then confirmed that Winton understood everything he had read. Winton replied, "Yeah. Like I say, I, I probably need an attorney, but I'm more than willing to talk to you all now." Phillips then informed Winton that he did not have to answer any questions. Winton then replied, "I want to cooperate."

{¶ 8} Winton indicated that he and Bonner were at his home the prior evening, and that they had been consuming liquor and smoking marijuana. According to Winton,

Bonner quickly consumed most of a bottle of Tanqueray gin. He indicated that Bonner regularly consumed large amounts of alcohol. At some point, Bonner asked him to help her to the bathroom. Winton stated that she was too intoxicated to make it on her own. He indicated that she leaned on his arm to walk to the bathroom. Winton stated that Bonner lost her balance and fell, and that she pulled him down as well. She fell forward and hit her face on the tile floor of the bathroom. Winton then helped her onto the toilet. He then picked her up after she was done. The couple returned to the den where Winton noticed blood on Bonner's face. He stated that he thought it was caused by a bloody nose.

{¶ 9} Winton further stated that he woke up the next morning around 7:30 or 8:00 a.m. Bonner was still asleep when Winton put her jeans back on her. He testified that he drove her back to her apartment building. He went up to her apartment to unlock the door, and then came back to the car to get her. He thought she was still intoxicated. He stated that her heart was beating. He stated that when a neighbor came out and observed him with Bonner, the neighbor indicated that he was going to call 911. Winton stated that he waited with Bonner until the police arrived.

{¶ 10} The interview lasted approximately 40 minutes. During that time, Rasor asked Winton whether he would consent to a search of his home. Winton hesitated in answering. Rasor asked him why he hesitated, at which time he replied, "I wouldn't mind if I could be present while they were going through the house." Rasor informed him that he could be present. Winton then signed a consent to search form. Winton was driven to his home by a patrol officer as his vehicle remained in police possession. Rasor and Phillips met him there. Winton was present with the detectives in the home while

evidence was collected by an evidence crew.

{¶ 11} On February 3, 2014, Rasor contacted Winton by telephone to arrange a meeting to answer more questions. She arranged for uniformed officers to transport Winton to the Safety Building as his car was still under police control. This second interview, which took place on February 4, was also recorded. Rasor and Winton executed another pre-interview form in the same manner as in the first interview, however, Winton did not make any mention of speaking to an attorney.

{¶ 12} In this interview, Winton indicated that he did not see blood on Bonner until he woke up the next morning. According to Winton, after they returned to the den from the bathroom he made a place to lay on the floor. He stated that Bonner began "rubbing on" him. He then performed oral sex on Bonner. He denied having intercourse. He stated that they slept on the floor of the den. Winton observed blood on Bonner's pillow when he woke up the next morning, and noticed that her chin was bruised and her lip was "busted." He stated that he went upstairs to wake up his roommate. He then decided to take Bonner home to let her "sleep it off." He indicated that he had done the same thing in the past.

{¶ 13} He also indicated that Bonner's head hit something while he was carrying her out of the house, and that it was hit again on the way to the car as well as getting into the car. He also indicated that he dropped her outside of her apartment building at which point she hit her head again. When asked, he was unable to account for injuries to Bonner's neck. This interview lasted for slightly longer than two and one-half hours at which time Winton was driven home.

{¶ 14} Winton was arrested on June 26, 2014. He was again taken to the Safety

Building for an interview. Rasor began to go over the pre-interview form at which point Winton stated that he wanted an attorney. The interview was then terminated.

{¶ 15} Winton was indicted on August 25, 2014 on one count of felony murder in violation of R.C. 2903.02(B) and one count of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1). He filed a motion to suppress statements made to the police, evidence collected during the search of his residence, and the collection of a DNA standard from him. A hearing on the motion to suppress was conducted on January 9, 2015. At the beginning of the hearing, Winton withdrew his request to suppress the DNA standard.

{¶ 16} Officer Matthew Osterday testified that when he arrived at the scene, he handcuffed Winton and placed him in the back of his cruiser. Winton then stated "[t]he medics are leaving. That must mean she is dead. My life is going to be over now." Supp. Tr. p. 13. Osterday testified that he had not asked any questions of Winton, and that the statement was not made in response to a question. Osterday testified that Winton was transferred to another cruiser, and that he was then transported to the Dayton Police Safety Building.

{¶ 17} Dayton Police Officer Robert Clingner testified that he transported Winton from the scene to the Safety Building. He testified that he did not ask Winton any questions, and that Winton made no statements to him.

{¶ 18} Rasor testified that she was the lead detective on the case. She testified that she went over the pre-interview form with Winton during both the first and second interviews. She testified that Winton was not threatened or mistreated during either interview. She testified that he did not ask for food or to use the bathroom. She testified

that he was offered water which he declined. She testified that he did not show signs of intoxication at either interview. She testified that she concluded he had not made a request for an attorney during the first interview because he kept repeating that he wanted to talk and cooperate. Rasor testified that Winton did not make reference to an attorney during the second interview. She testified that she attempted to interview him on the day of his arrest, but Winton stated that he wanted an attorney and the encounter was terminated.

{¶ 19} Following the hearing, the trial court overruled the motion. The matter proceeded to a trial to the judge in February 2016.

{¶ 20} The State presented the testimony of Kevin Koob, a resident of the same apartment building as Bonner. Koob testified that he and Bonner were friends, and that they were together for 10 to 20 minutes on February 1, 2014. He did not observe any injuries at that time. On February 2, someone knocked on Koob's apartment door. Thereafter, Koob went to the back stairwell of the building where he observed Winton, whom he did not know, standing next to a woman's body. The body was on its back on the stairs. Koob did not recognize the woman. According to Koob, Winton told him that the woman was just drunk and passed out. Koob testified that the woman's skin was cold and she had no heartbeat. He thus told Winton that he thought she was dead, and that Winton was in trouble.

{¶ 21} The State then introduced the recording of the call made to 911. On that recording, a man stated that he had observed a man dragging a woman through the front door of the apartment building. He also stated that it appeared that the woman was dead.

{¶ 22} Dayton Police Detective Michael Baker also testified. He was first to appear on the scene. He testified that he observed that although it was very cold outside, Winton was sweating profusely. Baker testified that Winton stated that the woman had been drinking. Baker testified that Bonner's body was cold, and that rigor mortis had set in. He instructed Osterday, who arrived on scene just a few moments after him, to place Winton in handcuffs.

{¶ 23} Dayton Fire Department paramedic Joseph Wiley testified that he arrived at the scene at 11:52 a.m. He testified that the body had no pulse, was cool to the touch, and was in rigor mortis.

{¶ 24} Dayton Detective Daryl Smith testified that when he arrived on scene, he observed drops of blood on the steps leading to the door of the building, as well as a smear of blood on the door. He testified that he observed that one of Bonner's shoes as well as the snap-on hood of her jacket were by the stairwell door. Smith found a debit card on Bonner's person. He then obtained a list of residents in the building. Smith proceeded to Bonner's apartment and observed that the door was partially open. He testified that the apartment was very neat and orderly.

{¶ 25} Brian Casto, a forensic scientist and Deputy Coroner for the Montgomery County Coroner's Office testified that he performed the autopsy of Bonner's body. He testified that her lips were swollen, and that they had multiple lacerations on the inside. Her tongue had extensive bruising. He testified that she had a "pattern injury" on her left forehead as well as on her right upper chest and left shoulder[1] He also observed an

---

[1] Casto testified that a pattern injury involves hitting, or being hit by, an object which then leaves an imprint on the skin in the form of either an abrasion or a contusion.

abrasion to the left hairline, a large bruise to the chin, bruising to the left side of her face, a blackened right eye, bruising to the right and left biceps, bruising to the jaw line, and several different injuries to both sides of the neck. She had "full thickness" bruising on both sides of her head.[2] Petechial hemorrhaging was noted in both eyes. Casto found extensive bruising to Bonner's neck beginning with the skin layer and proceeding through each layer of muscle all the way to the thyroid gland and larynx. Casto testified that both the petechial hemorrhaging and neck bruising were consistent with strangulation. He testified that Bonner had a blood alcohol content of .381, and that she tested positive for marijuana. He testified that she did not have liver disease. Finally, he testified that Bonner died from blunt force head trauma and strangulation, and that the death was determined to be a homicide.

{¶ 26} Dayton Police Department Crime Scene Investigator Michael McDonald testified that he processed the scene, Winton's vehicle, and Winton's home. In addition to the blood on the steps and door of the building, he found blood on the passenger door and seat of Winton's vehicle. He testified that it appeared that some of Bonner's hair had been torn away. McDonald testified that he found blood on the floor of Winton's home just inside the front door. Some of the blood was smeared, and some consisted of droplets. No blood was found in the bathroom, although two clumps of hair were found on the floor. Further, there was no evidence of any blood between the bathroom and the den. McDonald testified there was a bottle of Tanqueray in the den along with a pillow that had blood on it.

---

[2]  Full-thickness bruising means that the bruising went through the scalp to the level of the skull.

{¶ 27} Mary Cicco, a forensic scientist in serology and DNA with the Miami Valley Regional Crime Laboratory, testified that the evidence collected by McDonald was submitted to her for analysis. She testified that she found Bonner's blood on both the front and back of her clothing. Cicco also found traces of Winton's semen in Bonner's rectum and vagina. She testified that semen can remain in the rectum, at most, for three days.[3]

{¶ 28} The State presented the testimony of Winton's roommate, Roger Parker. Parker testified that he arrived home on February 1 at approximately 9:00 or 9:30 p.m. He testified that Winton approached him and stated, "I have company. My girl is here. We're gonna have sex." Tr. p. 166. Parker did not see the woman. He then went upstairs. According to Parker, he woke up at 8:00 a.m. the next day, and left for church at 9:00 a.m. Parker denied being awakened by Winton. He did not return home until 2 p.m. He testified that he did not hear any fighting or loud noises.

{¶ 29} At the close of the State's case, Winton made a Crim.R. 29 motion for acquittal that was denied by the trial court. Winton then presented the testimony of Adel Shaker, M.D., who testified that he is the Chief Deputy Medical Examiner and Forensic Pathologist for Nueces County, Texas. Shaker testified that he reviewed all of the records relating to the case. Shaker testified that he believed Bonner could have liver disease. He further testified that he did not agree with Casto's determination as to cause of death which Shaker stated was acute alcohol intoxication. Finally, Winton presented two character witnesses who testified that Winton is peaceful and non-violent.

---

[3] During his interviews, Winton denied having intercourse with Bonner on February 1. He also indicated that he had not seen Bonner for four to five days prior to February 1.

{¶ 30} The State then presented the testimony of Montgomery County Coroner Kent Harshbarger in rebuttal. Harshbarger testified that his review of the case supported Casto's findings.

{¶ 31} The trial court found Winton guilty of both counts of the indictment. The court merged the counts for sentencing and the State elected to proceed on the murder count. The trial court sentenced Winton to a prison term of 15 years to life. The trial court also ordered Winton to pay restitution in the amount of $3,593.63.

{¶ 32} Winton appeals.

## II. The Record Contains Evidence Sufficient To Support The Convictions.

{¶ 33} Winton asserts the following for his first assignment of error:

THE TRIAL COURT ERRED BY DENYING APPELLANT'S CRIMINAL RULE 29(A) MOTION FOR ACQUITTAL ON THE CHARGES OF MURDER AND FELONIOUS ASSAULT.

{¶ 34} Winton contends that the trial court erred in denying his Crim.R. 29 motion for acquittal at the close of the state's case. In support, he argues the State did not prove that he knowingly caused serious physical harm to Bonner. Specifically, he notes that the State did not present evidence of the object that caused geometric patterns on Bonner, evidence of a struggle at his home, evidence of the means of strangulation, or evidence of any wounds to Winton. He also notes that his roommate did not hear any argument or struggle.

{¶ 35} "Motions for acquittal pursuant to Crim.R. 29 address the sufficiency of the

state's evidence." *State v. Smith*, 150 Ohio App.3d 45, 2002-Ohio-5994, 779 N.E.2d 776, ¶ 9. "Under Crim.R. 29, a motion for acquittal may be granted only if the evidence is insufficient to sustain a conviction for the offense charged." *Id.* "[P]ursuant to Crim.R.29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *Id.*, quoting *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. In our review of the court's determination, we must construe the evidence in favor of the state. *Id.*

{¶ 36} Winton was convicted of murder and felonious assault. Felony murder is proscribed by R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." Winton was also convicted of the predicate offense of felonious assault under R.C. 2903.11(A)(1). This statute provides that "[n]o person shall knowingly * * * cause serious physical harm to another * * *." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 37} The evidence presented at trial established that Bonner died from strangulation and from blunt force trauma to her head. She suffered numerous injuries to her head, neck and body. The injuries to her face prevented Bonner's friend, Kevin Koob, from recognizing her when he went out to the stairwell and observed her body. The evidence further established that she was not injured prior to going to Winton's home.

Winton does not claim that Bonner encountered anyone else between the time she arrived at his home and the time he was found on her stairs with her body. While Winton attributed the head injuries to the fall in the bathroom, and successive hits to the head while he carried Bonner out of his home and into her building, he was unable to account for the injuries to her neck.

{¶ 38} Casto testified that the type of injuries to Bonner's neck could not have been caused by carrying her or by bumping her head into objects. Instead, he testified that the injuries to the neck required significant force. He testified that the injuries were "more typical of someone being stepped on or actually grabbed by the neck." Tr. p. 310.

{¶ 39} Winton notes that the State did not produce any evidence of a struggle in his home or any evidence of wounds to him that would indicate a struggle. We find this disingenuous. Winton himself noted that Bonner was passed out from drinking. A reasonable inference could arise that he injured her while she was unconscious. Thus, evidence of a struggle or wounds to Winton would not be expected. Further, the fact that the State was unable to produce evidence as to what object caused the pattern injuries or how Bonner was strangled does not negate that she was with him when these injuries occurred. Further, Winton did not attempt to claim that the injuries, other than the fall in the bathroom, were the result of Bonner's actions.

{¶ 40} Regardless of whether the State produced the evidence cited above by Winton, the trial court could reasonably have found that Winton caused serious physical harm to Bonner that resulted in her death. And given the severity of the injuries and subsequent death, the court could have reasonably inferred that Winton acted knowingly.

{¶ 41} We conclude that Winton's convictions for murder and felonious assault are

supported by sufficient evidence, and that the trial court did not err in denying his motions for acquittal with respect to these offenses

### III. The Convictions are Supported By the Evidence.

**{¶ 42}** Winton's second assignment of error is as follows:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 43}** Winton contends that the State presented only circumstantial evidence that was not sufficient to support a finding that he strangled or beat Bonner. He also cites *State v. Kulig*, 37 Ohio St.2d 157, 160, 309 N.E.2d 897 (1974), for the proposition that "it is settled that where circumstantial evidence alone is relied upon to prove an element essential to a finding of guilt, it must be consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence." However, we note that *Kulig* was expressly overruled by *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). Circumstantial evidence is as inherently probative as direct evidence. *In re A.K.*, 2d Dist. Montgomery No. 21504, 2007-Ohio-2095, ¶ 21.

**{¶ 44}** When reviewing a judgment under a manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio

App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶ 45} Based upon the evidence in this record, we cannot say that the trial court lost its way in finding Winton committed the charged offenses. Although Winton presented an expert and two character witnesses, the trial court was not required to find their testimony credible. Further, the trial court was free to find the medical experts presented by the State more credible. Also, Winton's claimed version of the events is rendered less credible by the fact that he denied having intercourse when his semen was found in Bonner's rectum and vagina, and by his claim that he carried Bonner when he was observed dragging her body to the back stairwell of the building rather than using the building's centrally located elevator. Also, Winton claimed to see blood on Bonner on the night of February 1 in his first interview, but changed his story to indicate that he saw no blood until the next morning. Further, as previously stated, there was no blood in the bathroom to support his claim that Bonner fell on her face in there.

{¶ 46} The second assignment of error is overruled.

### IV. The Trial Court Did Not Err In Denying Winton's Motion To Suppress.

{¶ 47} Winton's third assignment of error states:

THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS AND TRIAL COUNSEL WAS INEFFECTIVE FOR ACCEPTING THAT MIRANDA HAD NO APPLICATION.

{¶ 48} Winton claims that the police elicited statements from him after he had invoked his right to counsel. Thus, he contends that the trial court erred by failing to

suppress those statements made during the two interviews. He further contends that the search of his home was improper as he was intimidated and coerced into consenting to the search. Finally, he claims that trial counsel was ineffective. Although far from clear in his brief, it appears that Winton believes that counsel either conceded that the interviews were not custodial or that counsel conceded that Winton waived his invocation of his right to an attorney.

**{¶ 49}** "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *Id*

**{¶ 50}** First, we note the evidence establishes that Winton was properly informed of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Winton does not appear to dispute this fact. Therefore, we turn to the issue of whether he invoked his right to counsel.

**{¶ 51}** In *State v. Myers*, 2d Dist. Darke No. 1643, 2006–Ohio–1604, we stated:

Whether a suspect has invoked his right to counsel is an objective inquiry. *Id.*

[*Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)]. A request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel. *Davis*, 512 U.S. at 459; see *State v. Murphy*, 91 Ohio St.3d 516, 520, 2001–Ohio–112, 747 N.E.2d 765. The Supreme Court of Ohio has held that the statement "I think I need a lawyer" was not an unequivocal assertion of the right to counsel. *State v. Henness*, 79 Ohio St.3d 53, 63, 679 N.E.2d 686 (1997). "Don't I supposed to have a lawyer present" has also been found to be ambiguous. *State v. Brown*, 100 Ohio St.3d 51, 56, 2003–Ohio–5059, 796 N.E.2d 506. "If a suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis*, 512 U.S. at 461–62; *Brown*, 100 Ohio St.3d at 56, 796 N.E.2d 506. Moreover, the officers have no obligation to ask clarifying questions to ascertain if the suspect is attempting to invoke his right to counsel. *Davis*, supra.

*Myers* at ¶ 66.

{¶ 52} We have reviewed the recording of both interviews, as well as the pre-interview forms. None of Winton's references to a lawyer constituted an unambiguous request for counsel, particularly when taken in context. He stated that "maybe" a lawyer should be present, and that he "probably" needed an attorney. However, his statements were qualified by his statements that he wanted to cooperate and that he was willing to be interviewed without an attorney. Further, the record demonstrates that Rasor and Phillips both clearly reiterated his right to an attorney and to stop the interview at any

point. Thus, we conclude that the trial court did not err in overruling the motion to suppress with regard to this issue.

{¶ 53} We next turn to the claim that Winton was coerced into signing the consent to search form regarding his residence. In the recordings of the interviews, Winton shows no visible sign of impairment, nor does he claim impairment. The interviews were not confrontational, but instead appeared to be calm and conversational.[4] There is no evidence that Winton was deprived of food, water or restroom visits, or that he was mistreated. Winton appears to be lucid and capable of making decisions. He does not appear anxious or nervous. Instead, his demeanor suggests that he was eager to cooperate with the police. Rasor asked him whether he would consent to the search. Although he hesitated when responding, he ultimately indicated that he had no objection to a search so long as he was able to be present during the search. Upon learning that he could be present, Winton signed the consent to search form. Based upon all the testimony and facts of this case, we cannot say that the trial court erred in finding that the consent-to-search form was voluntarily and knowingly signed

{¶ 54} Based upon our review of the interviews, the transcript of the hearing and the executed consent and waiver forms, we agree with the trial court that the record fails to demonstrate that Winton invoked his right to counsel or that he was coerced into executing the consent to search his home. We need not address any claim that trial counsel was ineffective as we find no error, let alone prejudicial error, in the trial court's decision.

---

[4] Winton does claim that Detective Roberts was abusive and intimidating "to the point of throwing his clipboard and arguing with [Winton]." However, we have reviewed the cited portion of the recording, and conclude that this claim lacks merit.

**{¶ 55}** The third assignment of error is overruled.

## V. Restitution Was Properly Ordered.

**{¶ 56}** The fourth assignment of error raised by Winton states:

THE TRIAL COURT ERRED WHEN IT ORDERED APPELLANT TO PAY

RESTITUTION.

**{¶ 57}** Winton claims that he is indigent and has no means to pay restitution. Thus, he contends that the trial court erred by ordering restitution.

**{¶ 58}** Winton did not object to the order of restitution at the trial level. Thus, we review this argument under the plain-error standard of review. *State v. Tate*, 2d Dist. Montgomery No. 25386, 2013-Ohio-5167, ¶ 51. R.C. 2929.19(B)(5) requires the trial court to consider an offender's present or future ability to pay before it may impose financial sanctions. *Id.* at ¶ 52. The trial court is not required to consider any specific factors or conduct a hearing on the issue. *Id.* The statute does not require that a trial court expressly state that it considered the defendant's ability to pay. *Id.* However, the record should contain evidence that the trial court did consider the ability to pay. *Id.*

**{¶ 59}** A review of the record demonstrates that after imposing sentence, the trial court addressed the matter of restitution for funeral expenses. The trial court indicated that it had reviewed the pre-sentence investigation report, and noted that Winton had been injured at work and was receiving disability benefits. The record indicates that Winton will continue to receive these benefits while incarcerated. Thus, the trial court found that he had the ability to pay restitution.

**{¶ 60}** We find no error on this record. Therefore, the fourth assignment of error

is overruled.

## VI. Conclusion

{¶ 61} All of Winton's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Lynne R. Nothstine
Michael T. Columbus
Hon. Timothy N. O'Connell