[Cite as *State v. Mukes*, 2020-Ohio-127.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28350 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-1538 |
| | : | |
| JOHN T. MUKES | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 17th day of January, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

TRAVIS KANE, Atty. Reg. No. 0088191, 130 West Second Street, Suite 460, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, John T. Mukes, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of felony murder and felonious assault; the offenses merged and he was convicted of murder. In support of his appeal, Mukes contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons outlined below, Mukes' judgment of conviction will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On July 14, 2017, the Montgomery County Grand Jury returned an indictment charging Mukes with one count of felony murder in violation of R.C. 2903.02(B) and one count of felonious assault in violation of R.C. 2903.11(A)(1). The charges stemmed from the murder of Mukes' 78-year-old mother, Mary Hinesmon. It was alleged that Mukes beat and strangled Hinesmon to death in her bedroom at a home on Hoover Avenue in Dayton, Ohio.

{¶ 3} Mukes pled not guilty to the charges and the matter proceeded to a jury trial. At trial, it was established that Mukes called 9-1-1 on the morning of July 3, 2016, and reported that Hinesmon was "beat to death." The State presented an audio recording of Mukes' 9-1-1 call and it was admitted into evidence as State's Exhibit No. 43. On the recording, Mukes can be heard advising the emergency responder that he lived with Hinesmon and that she had been attacked the previous night while he was out "jogging down the street." Mukes told the responder that he had left the door to their residence open and that someone had come into the residence while he was gone.

{¶ 4} When the police arrived at the scene, Hinesmon was found dead on her bedroom floor. Detective Rod Roberts testified that Hinesmon's body was found wrapped in a bedsheet, part of which was torn and wrapped around Hinesmon's neck. Photographs of Hinesmon's body were taken at the scene and admitted into evidence as State's Exhibit Nos. 67-72. The photographs confirmed Roberts' testimony and also showed that part of the bedsheet was covering Hinesmon's mouth.

{¶ 5} Hinesmon's niece who lived across the street, Inez Harbour, testified that she went to Hinesmon's residence on the morning in question prior to the police arriving. Harbour testified that she went to the residence because Mukes' girlfriend, Tara Haines, knocked on her door and told her about Hinesmon's unresponsive condition. Harbour testified that when she arrived at the residence, Mukes was standing in the living room emotionless with blood on his t-shirt. Harbour, a registered nurse, testified that when she went to check on Hinesmon, she found Hinesmon lying on her bedroom floor wrapped in her bedding. Harbour testified that she checked Hinesmon's pulse and found none. Harbour testified that she did not attempt to perform any life saving measures because Hinesmon "was gone." Trial Trans. p. 335.

{¶ 6} Harbour further testified that she had previously visited Hinesmon's residence "hundreds" of times and noted that nothing was out of place in the residence on the morning in question. Id. at 331, 339-340. Harbour also noted that there was no sign of any damage to the residence. Multiple responding officers, including Detective Roberts, Sergeant Robert Clinger, Officer Joshua Campbell, and evidence technician Mark Hamilton similarly testified that they observed no signs of forced entry into the residence. Clinger, Campbell, and Hamilton further testified that they observed blood on

Mukes' t-shirt.

{¶ 7} After the police arrived at the scene, Harbour testified that Mukes said to himself "I wouldn't hurt my mama. I didn't do nothing to my mama." *Id.* at 335. Sergeant Clinger also testified that when he asked Mukes what was going on, Mukes said "she wouldn't let me leave last night." *Id.* at 377. Clinger documented Mukes' statement in his police report and also reported it to Detective Roberts. Roberts testified that when he later interviewed Mukes' girlfriend, Haines, she confirmed that Mukes' had made that statement to Clinger.

{¶ 8} Detective Roberts also testified that he observed a fresh scratch on the right side of Mukes' neck while Mukes was sitting in the backseat of Sergeant Clinger's police cruiser. Clinger testified that a short time after placing Mukes in his police cruiser, Mukes began to hit his forehead against the partition that separates the front and rear cabins of the cruiser. The State presented video footage from Clinger's cruiser camera that showed Mukes sitting calmly in the back of the cruiser for approximately 20 minutes before starting to bang his head on the partition. The video footage showed that Mukes was only hitting the top of his forehead with slight force and was not causing injury to himself or any other part of his body. The video also showed Clinger placing his hand between Mukes' head and the partition to prevent any injury to Mukes' person. *See* State's Exhibit No. 116.

{¶ 9} Officer Campbell testified that Mukes was eventually transferred to his police cruiser, in which he was taken to the hospital for a mental health evaluation. Campbell testified that he sat in the back of the police cruiser with Mukes to ensure that Mukes did not harm himself. Campbell testified that Mukes was calm during his transport to the

hospital and suffered no injuries while in his presence.

{¶ 10} After arriving at the hospital, Officer Campbell testified that evidence technician Hamilton arrived to take pictures of Mukes and to collect Mukes' clothing. Hamilton testified that he photographed the scratch on the right side of Mukes' neck that was observed by Detective Roberts. Hamilton also photographed blood on Mukes' right ear, a scratch on the bridge of his nose, and a small scratch on one of his ring fingers. Detective Roberts testified that he observed the scratch on Mukes' nose at the hospital and noted that it also appeared to be a fresh wound. Roberts testified that a decision was then made to arrest Mukes for Hinesmon's murder.

{¶ 11} Officer Campbell testified that Mukes became aggressive when he advised Mukes that he was being placed under arrest. Campbell testified that Mukes would not comply with his order to turn around so that Mukes could be handcuffed. According to Campbell, Mukes pushed him and squared off in a fighting position when Campbell attempted to physically turn Mukes around. Campbell testified that when Mukes refused to turn around a second time, he tased Mukes so that he could get him to the ground and handcuff him. Campbell testified that he was eventually able to handcuff Mukes with the assistance of a sheriff's deputy. Once handcuffed, Campbell transported Mukes to jail.

{¶ 12} Dr. Kent Harshbarger, the coroner who autopsied Hinesmon's body, testified that Hinesmon had several abrasions, scratches, and contusions on her face, neck, and chest. Harshbarger also testified that Hinesmon had conjunctival petechiae (burst capillaries) in her eyes and injuries to her fingers. The injuries to Hinesmon's fingers included avulsions (missing tissue), lacerations, ripped-off fingernails, and a crushed ring finger. Photographs of these injuries were taken at the autopsy and

admitted into evidence as State's Exhibit Nos. 1-31. Harshbarger testified that Hinesmon's injuries were indicative of her being struck multiple times and strangled. Harshbarger testified to a reasonable degree of medical certainty that Hinesmon's cause of death was due to strangulation.

{¶ 13} Mary Barger, a forensic DNA analyst from the Miami Valley Regional Crime Lab, testified that she performed DNA testing on various items of evidence in this case. Barger testified that she tested the bloodstains on Mukes' t-shirt and found only Mukes' and Hinesmon's DNA on the stains. Barger also noted that a majority of the DNA from the bloodstains belonged to Hinesmon. Barger additionally testified to testing swabs taken from Mukes' fingernails. Barger testified that she only detected Mukes' and Hinesmon's DNA on the fingernail swabs, a majority of which belonged to Hinesmon. Barger also tested a spot of blood on Mukes' left shoe and found only Hinesmon's DNA present.

{¶ 14} Barger further testified that Mukes' DNA was detected underneath one of Hinesmon's right fingernails and that the bedding used to strangle Hinesmon contained a mixture of only Mukes' and Hinesmon's DNA. In addition, Barger testified that Mukes could not be excluded as a contributor to the DNA that was found on Hinesmon's neck.

{¶ 15} After presenting the foregoing testimony and evidence, the State rested its case. Mukes then moved for an acquittal under Crim.R. 29, which the trial court overruled. Thereafter, Mukes testified in his defense.

{¶ 16} While testifying, Mukes claimed that during the early morning hours of July 3, 2016, he left his house and walked down the street to a friend's house to drink and play cards. Mukes claimed that his mother was home when he left and that he forgot to lock

the door before leaving. Mukes testified that he returned home around 6:00 a.m. and laid down to rest until 8:30 a.m. Mukes testified that he then went into his mother's bedroom to check on her because he did not hear her getting ready for church.

{¶ 17} Continuing, Mukes testified that when he went into his mother's bedroom he found his mother lying on the floor with "all the blood and stuff." Trial Trans. p. 612. Mukes testified that he tried grabbing and shaking his mother to revive her. Mukes also claimed that he attempted to perform CPR on his mother by lifting her up with his hands, holding her by the neck, and blowing in her mouth. Mukes testified that when she did not revive, he called 9-1-1 and his girlfriend, Haines, for help.

{¶ 18} During his cross-examination, Mukes admitted that he had told the 9-1-1 responder that he had been out for a jog when his mother was attacked. Mukes also admitted to having mobility issues and to occasionally walking with a cane. Mukes further admitted to saying "I didn't hurt my mama" when the police arrived at the scene. Mukes, however, denied telling Sergeant Clinger that "she wouldn't let me leave last night."

{¶ 19} At the close of the evidence, the jury deliberated and found Mukes guilty of both felony murder and felonious assault. During sentencing, the trial court merged the offenses and ordered Mukes to serve 15 years to life in prison for murder. Mukes now appeals from his conviction, raising a single assignment of error for review.

**Assignment of Error**

{¶ 20} Under his sole assignment of error, Mukes contends that his conviction for felony murder was not supported by sufficient evidence and was against the manifest

weight of the evidence.   We disagree.

*Standard of Review*

{¶ 21} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).   "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt."   (Citations omitted.)   *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).   "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.)   *Id.*

{¶ 22} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   "The fact that the

evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14. "A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." *Id.*, citing *Martin* at 175.

*Law and Analysis*

{¶ 23} As previously discussed, Mukes was convicted of felony murder in violation of R.C. 2903.02(B). That statute provides that: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" R.C. 2903.02(B). "Therefore, in order to convict a defendant of felony murder, the State is not required to prove that the defendant had an intent to kill, but instead must prove that the defendant intended to commit the underlying felony that proximately caused the victim's death." *State v. Slaughter*, 2d Dist. Montgomery No. 25215, 2014-Ohio-862, ¶ 35, citing *State v. Mays*, 2d Dist. Montgomery No. 24168, 2012-Ohio-838, ¶ 6.

{¶ 24} It is well-established that felonious assault may serve as the underlying offense of violence for a felony murder conviction. *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, syllabus. In this case, Mukes was also found guilty of felonious assault in violation of R.C. 2903.11(A)(1), which provides that: "No person shall knowingly * * * [c]ause serious physical harm to another[.]" R.C. 2903.11(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A

person has knowledge of circumstances when the person is aware that such circumstances probably exist."   R.C. 2901.22(B).

{¶ 25} A person causes "serious physical harm" to another when he or she causes "[a]ny physical harm that carries a substantial risk of death[.]"   R.C. 2901.01(A)(5)(b). Strangling a person to death constitutes the "serious physical harm" necessary to support a charge of felonious assault, which in turn supports a charge for felony murder.   *See State v. Winton*, 2d Dist. Montgomery No. 27043, 2017-Ohio-6908, ¶ 37-38, 40-41; *State v. Ramey*, 2d Dist. Montgomery No. 27636, 2018-Ohio-3072, ¶ 61 (Hall, J. concurring in part and dissenting in part).

{¶ 26} In this case, Mukes does not dispute the fact that his mother's death was a homicide by strangulation, which no doubt satisfies the "serious physical harm" element of the underlying felonious assault.   Mukes instead argues that the State failed to present sufficient evidence establishing that he was his mother's assailant.   We disagree.

{¶ 27} There was no dispute that Mukes resided with his mother, and the State presented testimony and photographic evidence establishing that there was no forced entry into their residence on the morning of the murder.   The State also presented evidence of fresh injuries observed on Mukes' body after the police arrived at the scene. Specifically, Detective Roberts testified to observing fresh scratches on the right side of Mukes' neck and on the bridge of his nose.   Photographs of the scratches were admitted into evidence, along with photographs of other injuries on Mukes' body, including a small amount of blood on his right ear and a scratch on one of his ring fingers.   *See* State's Exhibit Nos. 36-41.   During their testimony, Detective Roberts and Officer Campbell confirmed that these injuries were observed and photographed prior to Mukes' physical

altercation with Officer Campbell and were therefore not a product of that altercation.

{¶ 28} In addition to Mukes' injuries, multiple witnesses testified that Mukes was wearing a blood-stained t-shirt on the morning of the murder. The State's forensic DNA analyst testified that the DNA extracted from the bloodstains was predominately from Mukes' mother and partially from Mukes himself. The DNA analyst also testified that there was blood on Mukes' left shoe that belonged to his mother and that his mother's DNA was also found under Mukes' fingernails. The DNA analyst further testified that Mukes' DNA was detected on the bedsheet that was wrapped around his mother's neck. Mukes also could not be excluded as a contributor to the DNA that was detected on his mother's neck.

{¶ 29} Most significantly though, the DNA analyst testified that Mukes' DNA was detected underneath one of his mother's right fingernails. During her testimony, the DNA analyst explained that DNA does not appear underneath a fingernail after casual contact, but instead from scratching or clawing another person, or in some instances sucking another person's finger. Therefore, because Mukes was observed with fresh scratches on his body and his DNA was found underneath his mother's fingernail, a rational juror could have concluded that the fresh scratches on Mukes' body were inflicted by his mother on the morning of the murder.

{¶ 30} Although Mukes argues that the aforementioned blood and DNA evidence was the result of him attempting to give his mother CPR, the photographic evidence and the testimony of Detective Roberts and the coroner establish that the bedsheet was still wrapped tightly around Mukes' mother's neck and was obstructing her mouth when officers arrived at the scene. *See* State's Exhibit Nos. 4-6, 67-72. At trial, Mukes could

not credibly explain why he did not attempt to loosen the sheet around his mother's neck before he allegedly performed CPR on her. Mukes also could not credibly explain how his mother's blood got on the back of his t-shirt.

{¶ 31} In addition to the DNA evidence and Mukes' injuries, the State presented evidence establishing that Mukes made multiple suspicious statements. For example, Inez Harbour testified that she overheard Mukes' say to himself "I wouldn't hurt my mama. I didn't do nothing to my mama." Trial Trans. p. 335. Sergeant Clinger also testified that when he asked Mukes what was going on, Mukes responded by saying "she wouldn't let me leave last night." *Id.* at 377.

{¶ 32} With regard to the statement "she wouldn't let me leave last night," the State presented evidence establishing that Mukes' mother owned two cars, a Ford Taurus and a Chevrolet Monte Carlo, and that Mukes drove the Monte Carlo while Hinesmon drove the Taurus. The State also presented evidence establishing that three days before his mother's murder, Mukes had been in a car accident that did not result in any significant physical injuries, but rendered the Monte Carlo inoperable. During the murder investigation, it was established that there was just one vehicle, Hinesmon's Ford Taurus, at the residence. Given this situation, and due to officers observing the keys to the Taurus lying on the kitchen table on the morning of the murder, *see* State's Exhibit Nos. 50-51, a rational factfinder could have inferred that Mukes' statement "she wouldn't let me leave last night" was possibly in relation to his mother not letting him use her vehicle, thus evidencing a motive for the attack.

{¶ 33} The State also presented evidence establishing that Mukes engaged in strange behavior after the police arrived at the scene. For example, the cruiser camera

video footage admitted into evidence shows Mukes banging his forehead against the cruiser's partition while he was sitting in the backseat. Mukes also resisted arrest at the hospital by engaging in a physical altercation with Officer Campbell. Prior to those incidents, Mukes was also observed to be emotionless and calm in the wake of his mother's violent death.

{¶ 34} Mukes was also inconsistent when explaining his whereabouts during the hours leading up to his mother's murder. On the recorded 9-1-1 call, Mukes, who admitted to having mobility issues and occasionally walking with a cane, told the emergency responder that he had been out jogging when the attack happened. Then, at trial, Mukes changed his story and testified that he had walked to a friend's house where he drank and played cards for a couple of hours before coming home and finding his mother's body. Notably, Mukes did not present any witnesses or evidence to confirm that story.

{¶ 35} When considered in a light most favorable to the State, all the foregoing testimony and evidence could have led a rational juror to conclude that Mukes was the individual who beat and strangled his mother to death. Therefore, based on the evidence presented at trial, we find that Mukes' conviction for felony murder and was supported by sufficient evidence. Also, after reviewing the entire record, weighing the evidence and all reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice warranting the reversal of Mukes' conviction. Accordingly, we further find that Mukes' conviction was not against the manifest weight of the evidence.

{¶ 36} Mukes' sole assignment of error is overruled.

## Conclusion

{¶ 37} Having overruled Mukes' assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Travis Kane
Hon. Mary Katherine Huffman