[Cite as *State v. Lambert*, 2021-Ohio-17.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28655 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-3041 |
| | : | |
| LEVI DALTON LAMBERT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of January, 2021.

. . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 426 Patterson Road, Dayton, Ohio 45419
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Levi Dalton Lambert appeals from his conviction for felony murder, improperly discharging a firearm at or into a habitation, and tampering with evidence. For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 2} This case arises from the August 5, 2018 shooting death of Evan Lewis. Following an investigation, Lambert was arrested and indicted on two counts of murder (proximate result) in violation of R.C. 2903.02(B), one count of felonious assault (serious harm) in violation of R.C. 2903.11(A)(1), one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), one count of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), and one count of tampering with evidence (alter/destroy) in violation of R.C. 2921.12(A)(1). All counts, except tampering with evidence, carried attendant three-year firearm specifications.

{¶ 3} During trial, the State presented the testimony of several witnesses. Taylor Baker testified that he resided with his grandmother on Hilgeford Drive in Huber Heights, and Lewis resided in the same neighborhood. Baker and Lewis had been friends since childhood, and they were at Baker's home on the day of the shooting. The pair decided to smoke marijuana while they set up a speaker system they had purchased. Lewis contacted Jared Beverly and arranged for Beverly to come by and sell them marijuana.

{¶ 4} When Beverly arrived at Baker's apartment building, Lewis and Baker went out to meet him. Beverly was seated in the driver's seat of his Jeep and Lambert was in the passenger seat. Baker knew Lambert from previous meetings, and the two engaged in a brief conversation. After purchasing the marijuana, Baker and Lewis returned to the

apartment.

{¶ 5} Approximately 45 minutes later, Lewis told Baker he saw a shadow outside Baker's bedroom window. The two were unable to see anything from the bedroom window, so they walked toward the kitchen at the back of the apartment. Baker remained in the doorway connecting the kitchen and the living room, while Lewis walked up to a sliding glass door located at the back of the kitchen. Lewis then grabbed a broomstick and hid by a washer and dryer unit located in the kitchen. Lewis informed Baker that Lambert was outside and that he had a gun.

{¶ 6} While Lewis was speaking, Baker also saw Lambert looking in the glass door. He observed Lambert pull a gun from his waistband, aim at the door and shoot. The glass from the door shattered. Lambert then pointed the gun at Baker and fired. The bullet hit the floor in front of Baker, who immediately ran from the room and hid in his bedroom. Baker heard several more gun shots and then silence. He stayed in his room for about two minutes and then went to see what had occurred. Baker observed Lewis, who was holding his chest area, exit the apartment and run in the direction of his own residence.

{¶ 7} Baker called 911 and reported that his friend had been shot by a person named Levi. Baker then went outside and observed Lewis on the ground. He also observed that the shorts Lewis had been wearing that day were missing. When questioned by the police, Baker identified the shooter as having long red curly hair. He also was able to pull up a picture of Lambert on Facebook.

{¶ 8} Johnny Shaw testified that, on the day in question, he was outside on his patio when he heard what sounded like firecrackers; he then observed Lewis running

down the sidewalk while holding his side. Shaw also observed that Lewis was bleeding. Shaw testified that he then saw a man with a red shirt and red hair running behind Lewis. After the men ran out of his view, Shaw told his girlfriend about what he had just observed. They left their apartment, walked around the building, and observed Lewis on the ground. The man with the red hair was gone.

{¶ 9} Wendy Hilbun also testified on behalf of the State. She was sitting in her car when she heard shots. Hilbun testified that she began to drive down the road and then saw Lewis run across the road. She also observed a man with red hair and a red shirt chasing Lewis. Hilbun testified she did not know the man pursuing Lewis, but she had previously observed him around the neighborhood. Hilbun lost sight of the men for a moment, during which time she pulled her car off the road at the end of an apartment building. She then observed Lewis on the ground. Hilbun testified that she saw the red-haired man "literally just stripping [Lewis's] clothes off of him." Tr. p. 356. At that time, Hilbun's fiancé exited the car and gave chase to the assailant while Hilbun called 911. During the call, she identified the assailant as "a redhead, wearing a red shirt." Tr. p. 358. Hilbun later identified Lambert as the assailant from a photographic array.

{¶ 10} Anthony Coile, who also lived in the same neighborhood, testified he observed a man with red hair running away from a person who was on the ground and who was in his underwear. Coile also identified Lambert from a photo array.

{¶ 11} Rodger Turner testified he heard loud bangs, then observed Lewis running down the road while being chased by a red-headed man. When Lewis collapsed onto the ground, Turner saw the red-headed man rifle through the pockets of Lewis's shorts before stripping off the shorts and running away with them. Turner also positively

identified Lambert as the assailant from a photographic array.

{¶ 12} Delia Williams testified that she was at home when she heard a "whizzing noise." Tr. p. 430. When she looked outside, she saw Baker's front door open and saw Lewis run out onto Bellefontaine Road. When Williams exited her home, she observed a man in a red shirt standing over Lewis. The man ran away when Williams approached. Williams then rendered aid to Lewis.

{¶ 13} Huber Heights Police Officer Troy Diltz testified about responding to the scene of the shooting. Diltz testified that he parked his cruiser at the intersection of two roads that were near the scene. As he was retrieving his shotgun from the trunk of the cruiser, Diltz observed a man with red hair and a red shirt walking in a field. He apprehended the man, who was later identified as Lambert.

{¶ 14} Because Lambert began to complain of chest pain, he was transported to a hospital. Diltz accompanied the ambulance. In the emergency room, Diltz collected Lambert's clothing. When Lambert removed his shoes, Diltz observed shards of glass which fell to the floor. Diltz collected the pieces of glass.[1]

{¶ 15} Jonathan Bateman, who lived on Bellefontaine Road near Baker's home, testified that Lambert came over to his residence in the morning on August 5, 2018. Lambert left for a while, but then returned. Bateman testified he was cleaning his apartment while Lambert was on his phone. When Lambert finished his phone

---

[1] The State presented evidence that the glass from the broken sliding glass door at Baker's apartment was also collected. A forensic scientist with the Ohio Bureau of Criminal Investigation testified that the shards of glass recovered from the apartment and those recovered in the hospital were indistinguishable.

conversation, he informed Bateman that "Skinny" was coming over.[2]

{¶ 16} When Skinny arrived, he joined Bateman and Lambert in Bateman's bedroom. Bateman testified that Skinny gave Lambert a gun. Bateman then told Lambert to leave. Bateman testified that he was on probation at that time and, as a condition of probation, he was not allowed to have guns. Bateman testified that Lambert tucked the gun into his waistband and left. According to Bateman, Lambert returned approximately 20 minutes later with "a ball of clothing in his arms." Tr. p. 633. Lambert began to speak to Skinny and Bateman heard Lambert state "I think I killed him." Tr. p. 634. Skinny became angry. When Lambert handed him the gun, Skinny took out the bullet cartridge and left with the gun. Bateman testified that he then escorted Lambert to the door, and Lambert said, "What am I supposed to do * * * why are you turning your back on me?" Tr. p. 637. As Lambert left, Bateman heard sirens approaching the neighborhood.

{¶ 17} The evidence established that, after the police spoke with Bateman, they contacted Skinny regarding the gun. Skinny claimed he threw the gun into a lake. He later changed his story and stated he threw the gun into some trees beside Needmore Road in Dayton.

{¶ 18} Patrick Mulligan, a Dayton attorney, testified that he represented Skinny in a different criminal matter. Mulligan was given a gun, delivered by Skinny's mother, and was told it might be relevant to Lewis's death. Mulligan contacted the prosecutor's office,

---

[2] The record demonstrates Skinny's actual name is Aaron Michael Joseph Kruetzer.

and the gun was taken into evidence by law enforcement.[3]

{¶ 19} Lambert was tried by a jury in November 2019. The jury convicted Lambert on all counts. At sentencing, the trial court merged the felony murder and felonious assault offenses. The State elected to proceed to sentencing on Count I, felony murder (proximate result). Lambert was sentenced to 15 mandatory years to life imprisonment. He was also sentenced to two years for improperly discharging a firearm into a habitation and nine months for tampering with evidence. All of the counts were ordered to run concurrently. Lambert was also sentenced to mandatory three-year prison terms for the firearm specifications attached to the felony murder and improper discharge counts, to be served consecutively to each other and consecutively to the prison sentence imposed for felony murder. Thus, the aggregate prison term was 21 years to life.

{¶ 20} Lambert filed a timely appeal.

## II.     Sufficiency and Manifest Weight of the Evidence

{¶ 21} The first assignment of error asserted by Lambert is as follows:

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST AND/OR

SUFFICIENT WEIGHT OF THE EVIDENCE.

{¶ 22} Lambert asserts that his conviction for felony murder was not supported by the evidence. Specifically, he claims the evidence presented by the State did not establish that he shot Lewis.

---

[3] The gun had one .40 caliber Hornady Smith and Wesson round in its magazine. The casings recovered from Baker's home were also .40 caliber Hornady bullets. It was determined that the bullets found in Baker's home and the bullet recovered from Lewis's body were fired from the gun provided by Mulligan.

{¶ 23} When a criminal defendant challenges the sufficiency of the evidence, he or she disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.) *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 24} In contrast, when a defendant contests the weight of the evidence, the argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. "Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 25} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11; *accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 26} "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 27} Lambert's argument centers on the fact that no one actually observed him shoot Lewis. Thus, he appears to object to the conviction for felony murder because the jury's finding of guilt necessarily rested upon circumstantial evidence.

{¶ 28} "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of

proof." (Citation omitted.) *State v. Biros*, 78 Ohio St.3d 426, 447, 678 N.E.2d 891 (1997); *In re A.K.*, 2d Dist. Montgomery No. 21504, 2007-Ohio-2095, ¶ 21.

{¶ 29} The record in this case contains evidence that Lambert obtained a gun from Skinny. Thereafter, Lambert appeared at Baker's home where Baker, who was familiar with Lambert, observed him shoot out the sliding glass door. Baker also observed Lambert fire another shot in his direction. As Baker fled into a different room, he heard more shots. After the shots subsided, Baker waited a minute and then emerged to survey the situation. He observed Lewis, who was holding his chest, leave the apartment and run in the direction of his own home.

{¶ 30} The State also presented the testimony of five disinterested witnesses who all heard gunshots and then observed Lewis a few moments later. Shaw, Hilbun and Turner observed Lewis running while being chased by a red-headed man. Turner and Hilbun observed the man remove Lewis's shorts.[4] Coile also witnessed a red-haired man run away from a person who was lying on the ground. Likewise, Williams observed Lewis run from Baker's home and then saw him lying on the ground while a man in a red shirt was standing over him. Turner, Hilbun and Coile identified Lambert from a photographic array.

{¶ 31} At the emergency room, Officer Diltz retrieved pieces of glass from Lambert's shoes. A forensic scientist was unable to distinguish between the glass collected at the hospital and the glass collected at Baker's apartment.

{¶ 32} Bateman testified that Lambert returned to his apartment and informed

---

[4] The police recovered a pair of shorts from a trash dumpster behind Bateman's apartment.

Skinny that he thought he had killed someone. Skinny became angry, and Lambert returned the gun to him. The gun was provided to the police by Skinny's attorney. It was determined the bullets recovered from Baker's apartment and the bullet recovered from Lewis's body were fired from that gun.

{¶ 33} This evidence linked Lambert to a gun which in turn was linked to the bullets found at the scene and in Lewis's body. Baker observed Lambert fire a gun at the sliding glass window and then again in Baker's direction. Baker heard several more shots, after which he observed Lewis holding his chest and running toward his home. The only shots fired were fired before Lewis left Baker's apartment, and the only person observed with a gun at the apartment was Lambert. Other people identified Lambert as the person who was seen chasing Lewis a few moments later. Based upon the evidence in this record, we cannot say the jury lost its way in concluding Lambert shot Lewis. Further, there was competent, credible evidence to support the convictions for discharging a firearm into a habitation and tampering with evidence.

{¶ 34} Lambert also challenges the credibility of Baker and Bateman on numerous grounds, attacks the credibility of the State's evidence regarding the retrieval of the gun, and notes that the State did not call Skinny to testify at trial.[5]

{¶ 35} When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The jury, as the fact-finder, "is free to believe

---

[5] If Lambert believed Skinny's testimony was crucial to his defense, he could have issued a subpoena for Skinny's attendance at trial.

all, some, or none of the testimony of each witness appearing before it." *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶ 36} Even assuming the jury found Baker and Bateman less than credible, there remained overwhelming evidence of Lambert's guilt, and every issue raised in Lambert's brief was presented to the jury for its evaluation. Moreover, we find nothing inherently incredible about the evidence concerning the tracing of the gun.

{¶ 37} The first assignment of error is overruled.

### III. Requested Jury Instructions

{¶ 38} Lambert's second assignment of error states:

THE TRIAL COURT ERRED IN REFUSING TO PROVIDE REQUESTED JURY INSTRUCTIONS.

{¶ 39} Lambert contends that the trial court erred by failing to instruct the jury on the offenses of involuntary manslaughter and reckless homicide as lesser-included offenses of felony murder.

{¶ 40} A trial court need only give those instructions that are relevant and necessary for the jury to weigh all of the evidence. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990). A defendant is only entitled to have his proposed jury instructions given when they are correct statements of the law, pertinent to the evidence in the record or to material issues, and are timely presented and not already included in the substance of the jury charge. *State v. Guster*, 66 Ohio St.2d 266, 269, 421 N.E.2d 157 (1981).

{¶ 41} "A criminal defendant is sometimes entitled to a jury instruction that allows

the jury to consider convicting the defendant of a lesser included offense as an alternative to convicting for the offense for which the defendant was charged." *State v. Owens*, Ohio Slip Opinion No. 2020-Ohio-4616, __ N.E.3d __, ¶ 8, citing *State v. Thomas*, 40 Ohio St.3d 213, 216-218, 533 N.E.2d 286 (1988). In Ohio, courts employ a two-part test to determine whether a jury instruction on a lesser included offense is necessary. *State v. Kidder*, 32 Ohio St.3d 279, 280-281, 513 N.E.2d 311 (1987). First, the trial court must determine whether the offense on which the instruction is requested is a lesser included offense of the crime charged. *Id.*, citing *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph three of the syllabus. Second, the trial court must determine whether the evidence adduced at trial would support an instruction on the lesser included offense. *Id.* at 281.

{¶ 42} The Supreme Court of Ohio has stated the following regarding the lesser included offense analysis:

> * * * An offense qualifies as a lesser included offense when "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 26. In making this assessment, a court compares the elements of each crime. *Id.* at ¶ 14. An offense that includes an element that another offense lacks cannot be a lesser included offense of that other offense.

*Owens* at ¶ 8.

{¶ 43} "When reviewing the trial court's jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction

was an abuse of discretion under the facts and circumstances of the case." *State v. Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 22. "The term, 'abuse of discretion' * * * implies that the trial court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if no sound reasoning supports the decision. *Id.* Accord *Aldo v. Angle*, 2d Dist. Clark No. 09-CA-103, 2010-Ohio-2008, ¶ 33.

**{¶ 44}** The felony-murder statute imposes "what is in essence strict liability." *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016, ¶ 9. "Though intent to commit the predicate felony is required, intent to kill is not." *Id.* Instead, "the mens rea of the underlying felony is imputed to the participant responsible for the killing. By operation of that legal fiction, the transferred intent allows the law to characterize a homicide, though unintended and not in the common design of the felons, as an intentional killing." *Id.*, quoting *People v. Hernandez*, 82 N.Y.2d 309, 317, 604 N.Y.S.2d 524, 624 N.E.2d 661 (1993).

**{¶ 45}** Recently, the Supreme Court of Ohio addressed the question of whether reckless homicide is a lesser-included offense of felony murder and noted that, while felony murder has no mens rea, "R.C. 2903.041, the reckless-homicide statute, contains a mens rea element with regard to the death of the victim." *Owens* at ¶ 11. Specifically, "[t]he statute defines reckless homicide as 'recklessly caus[ing] the death of another or

the unlawful termination of another's pregnancy.'" *Id.* "Because reckless homicide includes an element that felony murder lacks—being reckless with regard to the possibility of causing a death—it is possible for a person to commit felony murder without necessarily committing reckless homicide. For that reason, reckless homicide is not a lesser included offense of felony murder with a felonious-assault predicate. *Id.* at ¶ 16.

{¶ 46} Based upon the holding in *Owens*, we conclude that reckless homicide is not a lesser included offense of felony murder. Therefore, the trial court did not abuse its discretion in denying the request for such an instruction.

{¶ 47} We next turn to whether Lambert was entitled to a jury instruction on involuntary manslaughter as a lesser included offense of felony murder. Involuntary manslaughter under R.C. 2903.04(A) is a lesser-included offense of felony murder. *State v. Brundage*, 1st Dist. Hamilton No. C-030632, 2004-Ohio-6436, ¶ 9; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 19; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 79. Therefore, to determine whether the court should have given an instruction on involuntary manslaughter, we must go to the second prong of the test.

{¶ 48} Under the second prong, the court must examine the facts and determine whether the jury could have reasonably concluded that the evidence supported a conviction for the lesser offense and not the greater. *Kidder*, 32 Ohio St.3d 279, 280, 513 N.E.2d 311. The evidence must be considered in the light most favorable to the defendant. *State v. Campbell*, 74 Ohio App.3d 352, 358, 598 N.E.2d 1244 (1st Dist.1991). A court should give a charge on a lesser-included offense where the evidence presented at trial can reasonably support both an acquittal on the crime charged

and a conviction upon the lesser-included offense.   *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.

{¶ 49} R.C. 2903.04(A) defines involuntary manslaughter as causing "the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony.   It is almost identically worded to the felony murder statute but expands the definition to include any felony offense instead of limiting the predicate crime to a first- or second-degree felony offense of violence.

{¶ 50} Lambert argues he was entitled to the instruction because he was also convicted of improperly discharging a firearm into a habitation.   Thus, he claims "the jury should have had the opportunity to convict [him] of involuntary manslaughter, using the predicate felony of discharge of a firearm into a habitation, and not felonious assault."   He states that the "only substantive difference between felony murder and involuntary manslaughter is that felony murder requires a crime of violence as opposed to involuntary manslaughter, which requires commission of any felony."

{¶ 51} Lambert's argument fails to recognize that the offense of improperly discharging a firearm into a habitation is both a second-degree felony (R.C. 2923.161(C)) and an offense of violence as defined by R.C. 2901.01(9)(a).   Thus, even if the underlying offense were improper discharge of a firearm into a habitation, he would still be guilty of felony murder rather than involuntary manslaughter.   In other words, the jury could not have acquitted him of felony murder and convicted him of involuntary manslaughter under the facts of this case.

{¶ 52} Because Lambert has not demonstrated that the predicate offense for the murder was anything but a first- or second-degree offense of violence, he was not entitled

to the jury instruction on involuntary manslaughter in this case. *See Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, at ¶ 21; *State v. Sanders*, 5th Dist. Stark No. 2018 CA 4, 2018-Ohio-30, ¶ 35-37.

**{¶ 53}** We conclude that the trial court did not abuse its discretion by not allowing the jury to consider offenses of reckless homicide and involuntary manslaughter.

**{¶ 54}** The second assignment of error is overruled.

### IV.    Merger

**{¶ 55}** Lambert's third assignment of error provides as follows:

THE TRIAL COURT ERRED IN REFUSING TO MERGE COUNT V WITH

COUNTS ONE THROUGH FOUR.

**{¶ 56}** Lambert contends the conviction for improperly discharging a weapon at or into a habitation should have merged with the felony murder conviction for purposes of sentencing.    In support, he argues that he committed the offenses in the course of the same incident and that he had a single animus for each offense.    Specifically, he asserts "the purpose of shooting into the glass was not accomplished in order to gain entrance to the apartment, but rather, to cause harm to Evan Lewis - the same animus that was present" with respect to the other counts.

**{¶ 57}** Section 10, Article I of the Ohio Constitution prohibits multiple punishments for the same offense. This prohibition is codified at R.C. 2941.25, which states:

(A) Where the same conduct by defendant can be construed to constitute

two or more allied offenses of similar import, the indictment or information

may contain counts for all such offenses, but the defendant may be

convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 58} Multiple offenses do not merge if (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with a separate animus or motivation.  *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, syllabus.   Two or more offenses are dissimilar within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at syllabus.   A defendant bears the burden of establishing entitlement to merger, and we review a trial court's ruling on the issue de novo.  *State v. LeGrant*, 2d Dist. Miami No. 2013-CA-44, 2014-Ohio-5803, ¶ 15.

{¶ 59} R.C. 2923.161(A)(1) provides, "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual * * *."   An "occupied structure" is defined, in part, as a house or building, "occupied as the permanent or temporary habitation of any person, whether or not any person is actually present."   R.C. 2909.01(C).

{¶ 60} In Count V of the indictment, Lambert was charged with improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1).   That charge stated Lambert knowingly discharged a firearm into an occupied structure that was the

permanent or temporary habitation of its residents (here, Baker and his grandmother).

{¶ 61} "[A] violation of R.C. 2923.161(A)(1) occurs when an offender fires a gun into someone's habitation, regardless of the presence of people." *State v. Grayson*, 2017-Ohio-7175, 95 N.E.3d 1025, ¶ 8 (8th Dist.), citing *State v. Mallet*, 8th Dist. Cuyahoga No. 76608, 2000 WL 1176880 (Aug. 17, 2000) ("a defendant can be convicted of improperly discharging a firearm even when his conduct did not create a risk of harm to another person"). *See also Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 30. In other words, "the harm caused by improperly discharging a firearm into a habitation is to the 'occupied structure' itself." *Grayson* at ¶ 24; *Rosales* at ¶ 29 ("shots also caused separate harm to the apartments themselves.").

{¶ 62} Irrespective of whether Lambert's intent when firing at the sliding glass door was, as he claims, to ultimately injure Evans, the violation occurred when he fired his gun into that door.[6] The harm done was to the home. Further, the evidence indicated that Baker was in front of the glass door at the time Lambert shot and fired at the door. Thus, although not necessary for a conviction, the shot also endangered Baker.

{¶ 63} Even if the offenses of felonious assault and/or felony murder and discharging the firearm into the home were committed with the same conduct and animus, they involved separate, identifiable victims, and the harm caused by the improper discharge was distinct from the harm experienced by Lewis. Therefore, the trial court did not err by failing to merge the offense of improper discharge into a habitation with the felony murder.

---

[6] Forensic evidence established that the bullet fired into the sliding glass door was not the bullet found in Lewis's body.

{¶ 64} The third assignment of error is overruled.


## V.    Conclusion

{¶ 65} All of Lambert's assignments of error being overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .



HALL, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Charles W. Slicer, III
Hon. Timothy N. O'Connell